**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

WEINREIS ETHANOL, LLC, a North Dakota limited liability company;
LAPASEOTES LAND LLC, a Nebraska limited liability company;
DINKLAGE FEED YARD, INC., a Nebraska corporation; and
EAST COAST AG HOLDINGS LLC, a Delaware limited liability company,

      Plaintiffs,

v.

DAVID KRAMER;
COLORADO AGRI PRODUCTS, LLC, a Colorado limited liability company; and
JOHN AND JANE DOES NOS. 1-25,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs Weinreis Ethanol, LLC, a North Dakota limited liability company, Lapaseotes Land LLC, a Nebraska limited liability company, Dinklage Feed Yard, Inc., a Nebraska corporation, and East Coast Ag Holdings LLC, a Delaware limited liability company (together, the "Plaintiffs"), through their undersigned counsel, for their Complaint (the "Complaint") against Defendants David Kramer ("Kramer"), Colorado Agri Products, LLC, a Colorado limited liability company ("CAP"), and John and Jane Does Nos. 1-25 (together, the "Defendants"), allege as follows:

## I. <u>Nature of the Action</u>

      1.    Plaintiffs file this action in response to the Defendants' wrongful actions taken for their own personal gain or in ways that injured and harmed Plaintiffs.  While some of the

Defendants' wrongdoing set forth by this Complaint goes back a number of years, Plaintiffs through their investigation and due diligence only recently have discovered the full scope and extent of that wrongdoing as well as the devastating harm and injury that it is causing to Plaintiffs. What Plaintiffs describe in this Complaint concerning the Defendants' wrongdoing is based upon facts and information they recently obtained.

2. Bridgeport Ethanol, LLC ("Bridgeport"), is a producer of ethanol and distiller wet grains. Bridgeport's ethanol-production Plant is located in Bridgeport, Nebraska (the "Plant"). Bridgeport, through the purchase and processing of corn, manufactures ethanol and sells its products to purchasers of ethanol and grains throughout Nebraska and across the country. Today, Bridgeport produces more than 52 million gallons of ethanol per year and an average of approximately 382,000 tons of distiller wet grains per year.

3. Since 2007, CAP has served as the sole management company and commodities marketer for Bridgeport, providing management and oversight to Bridgeport as well as to two other ethanol-production companies, Sterling Ethanol LLC and Yuma Ethanol, LLC, each having ethanol plants located in Colorado.

4. Defendant Kramer is the co-founder, co-owner, and General Manager of CAP. Kramer is also the Managing Manager of Bridgeport under Bridgeport's Operating Agreement, and serves as one of four Class A Managers of Bridgeport's Board of Managers. In his various roles, Kramer has, since 2007, used his positions and power to control Bridgeport, including directing day-to-day decisions about Bridgeport and its operations.

5. Plaintiffs are members of and investors in Bridgeport. Plaintiffs have recently come to learn of Kramer's pervasive, repeated wrongdoing, individually, through CAP, and in

collaboration with others associated with CAP.  Kramer, individually and through CAP, has engaged in a concerted campaign of wrongdoing to further his own personal interests and those of his family, to the detriment and at the expense of Plaintiffs.  Among other things, Kramer obtained and/or used funds that otherwise would have gone to Plaintiffs by way of distributions for the purchase of personal equipment and products, and for the benefit of his family members, including his son Deric Kramer.  Kramer took such funds for his own use and/or used such funds to pay for or reimburse dues, fees, marketing and advertising, and sponsorship expenses for his personal race car teams or those in which he has interests, including American Ethanol Racing Team, Sterling Racing Team, Kramer Racing American Ethanol NHRA ProStock Team, and Deric Kramer Pro Stock Racing Team.  Kramer also used such funds to pay for advertising for his racing teams, including at Bandimere Speedway and the Julesburg Drag Strip, and to pay for annual membership dues with national stock car associations.

6.      Plaintiffs have also come to learn that, over a period of years, Kramer, individually and by and through CAP, oversaw a scheme to use Bridgeport proceeds that otherwise would have been distributed to Plaintiffs in order to pay inflated, over-market prices to various enzyme and product suppliers, from whom Bridgeport purchased enzymes and other products to produce ethanol.  In exchange for Bridgeport's payment of these inflated prices to the enzyme and products suppliers, the suppliers agreed to lucrative sponsorships of Kramer's personal racing teams, including American Ethanol Racing Team, Sterling Racing Team, and Deric Kramer Pro Stock Racing Team.  These sponsorships were set up in a "quid-pro-quo" arrangement, so that, by Kramer ensuring payments to these companies, Kramer could ensure

that he and his racing teams received lucrative sponsorships, amounting to more than hundreds of thousands of dollars.

7.      To further accomplish this wrongful scheme and ensure that it was not disclosed to Plaintiffs, Kramer terminated the employment of Bridgeport's General Manager, Ted Free, on May 19, 2021, after Kramer learned that Mr. Free had been looking into these sponsorship arrangements and was prepared to present his findings to the Bridgeport Board.  Kramer terminated Mr. Free the day after he learned that Mr. Free was planning to present his findings to the Bridgeport Board, and refused to allow the Bridgeport Board to receive the information and documents that Mr. Free wanted the Bridgeport Board to consider.

8.      Kramer, individually and through CAP, engaged in additional activities in violation of the Bridgeport Operating Agreement, such as diverting Bridgeport's units to his personal associates.  These actions have had a serious negative impact on Plaintiffs.

9.      In September 2021, to further conceal his wrongdoing, Kramer hired Trevor Morgan as the new General Manager for the Bridgeport Plant, without allowing the Bridgeport Board to provide any meaningful input into a replacement General Manager candidate following Mr. Free's termination, and without seeking or obtaining approval of the Board.  Mr. Morgan previously worked as a Senior Technical Account Manager for Phibro Ethanol Performance Group, one of Bridgeport's suppliers and a sponsor of Kramer's racing teams, and before that, at Novozymes Bioenergy, another of Kramer's sponsors.

10.     Plaintiffs have been and continue to be harmed and damaged by Kramer's wrongful conduct, individually and through CAP.  Defendants' wrongdoing is in clear violation of the Bridgeport Operating Agreement and applicable law.

## II.  Parties

**A.**     **Plaintiffs**

11.     Plaintiff Weinreis Ethanol LLC is a North Dakota limited liability company with its principal place of business in North Dakota.  Weinreis Ethanol LLC is a citizen of the States of North Dakota, South Dakota, Montana, and Nebraska for purposes of diversity jurisdiction:

       a.     Charles Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of South Dakota.

       b.     Garrett Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of South Dakota.

       c.     Eugene Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of North Dakota.

       d.     Peter James Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of North Dakota.

       e.     George Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of North Dakota.

       f.     Daniel Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of Nebraska.

       g.     Gerald Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of North Dakota.

       h.     Leland Weinreis is a Member of Weinreis Ethanol LLC and is a citizen of the State of North Dakota.

      i.      Dr. Don Beck is a Member of Weinreis Ethanol LLC and is a citizen of the State of Montana.

      j.      Bradley and Julie Zook are Members of Weinreis Ethanol LLC and are citizens of the State of North Dakota.

      k.      Weinreis Brothers Partnership is a Member of Weinreis Ethanol LLC and is a citizen of North Dakota, South Dakota, and Nebraska for purposes of diversity jurisdiction.

      1.      Charles Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of South Dakota.

      2.      Eugene Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of North Dakota.

      3.      Peter James Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of North Dakota

      4.      George Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of North Dakota.

      5.      Daniel Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of Nebraska.

      6.      Gerald Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of North Dakota.

      7.      Leland Weinreis is a Partner in Weinreis Brothers Partnership and is a citizen of the State of North Dakota.

12.     Plaintiff Lapaseotes Land LLC is a Nebraska limited liability company with its principal place of business in Nebraska.  Lapaseotes Land LLC is a citizen of the State of Nebraska for purposes of diversity jurisdiction:

     a.     Pete Lapaseotes is a Member of Lapaseotes Land LLC and is a citizen of the State of Nebraska.

     b.     Nicholas (Nick) Lapaseotes is a Member of Lapaseotes Land LLC and is a citizen of the State of Nebraska.

13.     Plaintiff Dinklage Feed Yard, Inc. is a Nebraska corporation with its principal place of business in Nebraska.  Dinklage Feed Yard, Inc. is a citizen of the State of Nebraska for purposes of diversity jurisdiction.

14.     Plaintiff East Coast Ag Holdings LLC is a Delaware limited liability company. East Coast Ag Holdings LLC is a citizen of the State of Delaware, Nebraska, and Minnesota for purposes of diversity jurisdiction.

     a.     The James W. Schiff Family Dynasty Trust is a member of East Coast Ag Holdings LLC and is a citizen of the States of Delaware, Nebraska, and Minnesota for purposes of diversity jurisdiction.

          1.     Terrence James Schiff is a trustee of the James W. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

          2.     James Scott Schiff is a trustee of the James W. Schiff Family Dynasty Trust, and is a citizen of the State of Nebraska.

          3.     Kimberley Schiff Glynn is a trustee of the James W. Schiff Family Dynasty Trust, and is a citizen of the State of Minnesota.

4.      James J. Lachall is a trustee of the James W. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

5.      Charles R. Lee is a trustee of the James W. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

b.      The Carol T. Schiff Family Dynasty Trust is a member of East Coast Ag Holdings LLC and is a citizen of the States of Delaware, Nebraska, and Minnesota for purposes of diversity jurisdiction.

1.      Terrence James Schiff is a trustee of the Carol T. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

2.      James Scott Schiff is a trustee of the Carol T. Schiff Family Dynasty Trust, and is a citizen of the State of Nebraska.

3.      Kimberley Schiff Glynn is a trustee of the Carol T. Schiff Family Dynasty Trust, and is a citizen of the State of Minnesota.

4.      James J. Lachall is a trustee of the Carol T. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

5.      Charles R. Lee is a trustee of the Carol T. Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

c.      The Terrence James Schiff Family Dynasty Trust is a member of East Coast Ag Holdings LLC and is a citizen of the States of Delaware, Nebraska, and Minnesota for purposes of diversity jurisdiction.

1.      James Scott Schiff is a trustee of the Terrence James Schiff Family Dynasty Trust, and is a citizen of the State of Nebraska.

      2.     Kimberley Schiff Glynn is a trustee of the Terrence James Schiff Family Dynasty Trust, and is a citizen of the State of Minnesota.

      3.     James J. Lachall is a trustee of the Terrence James Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

      4.     Charles R. Lee is a trustee of the Terrence James Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

    d.     The James Scott Schiff Family Dynasty Trust is a member of East Coast Ag Holdings LLC and is a citizen of the States of Delaware and Minnesota for purposes of diversity jurisdiction.

      1.     Terrence James Schiff is a trustee of the James Scott Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

      2.     Kimberley Schiff Glynn is a trustee of the James Scott Schiff Family Dynasty Trust, and is a citizen of the State of Minnesota.

      3.     James J. Lachall is a trustee of the James Scott Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

      4.     Charles R. Lee is a trustee of the James Scott Schiff Family Dynasty Trust, and is a citizen of the State of Delaware.

    e.     The Kimberley Schiff Glynn Family Dynasty Trust is a member of East Coast Ag Holdings LLC and is a citizen of the States of Delaware and Nebraska for purposes of diversity jurisdiction.

      1.     Terrence James Schiff is a trustee of the Kimberley Schiff Glynn Family Dynasty Trust, and is a citizen of the State of Delaware.

2.      James Scott Schiff is a trustee of the Kimberley Schiff Glynn Family Dynasty Trust, and is a citizen of the State of Nebraska.

3.      James J. Lachall is a trustee of the Kimberley Schiff Glynn Family Dynasty Trust, and is a citizen of the State of Delaware.

4.      Charles R. Lee is a trustee of the Kimberley Schiff Glynn Family Dynasty Trust, and is a citizen of the State of Delaware.

**B.**      **Defendants**

15.      Defendant Dave Kramer is an individual who is a citizen of Colorado.

16.      Defendant Colorado Agri Products, LLC is a Colorado limited liability company with its principal office and place of business at 450 Angus Avenue, Sterling, Colorado 80751. CAP is a citizen of the State of Colorado for purposes of diversity jurisdiction.

17.      Upon information and belief, CAP has two members, Defendant Kramer and William (Bill) Bornhoft, both of whom are citizens of the State of Colorado for purposes of diversity jurisdiction.

18.      Defendants John and Jane Does Nos. 1-25 are persons and entities whose identities are not presently known and, therefore, Plaintiffs sue such Defendants by fictitious names.  Plaintiffs will seek leave of Court to amend this Complaint to allege their true names and capacities when they have been ascertained.

19.      At all times relevant hereto, and upon information and belief, Defendants Kramer, CAP, and John and Jane Does Nos. 1-25 were the agents, representatives, and servants of each other, and/or materially aided, abetted, or encouraged each other's conduct described herein.

20.     Further, upon information and belief, at all times mentioned, Defendants Kramer, CAP, and John and Jane Does Nos. 1-25  have controlled one another, and are so influenced by each other, that they have no separate identity from one another, and they are the alter egos of one another.  Defendants Kramer, CAP, and John and Jane Does Nos. 1-25 held themselves out, acted, used their resources, and provided services as a single party or entity and did not distinguish themselves as independent from one another.  Piercing of veils is appropriate and necessary as the facts are such that adherence to the separate existence of each of Defendant would, under the circumstances, sanction wrongdoing and promote injustice.

### III.  Jurisdiction and Venue

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

22.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).

### IV.  General Allegations

**A.     Bridgeport**

23.     Bridgeport is a producer of ethanol and wet distiller grain products based in Bridgeport, Nebraska.  Bridgeport was formed on or around August 17, 2006.  As discussed more fully below, on February 20, 2007, Bridgeport entered into an Operating Agreement (the "Bridgeport Operating Agreement"), which has been signed by, among others, Kramer as Bridgeport's Managing Manager as well as by Plaintiffs.

24.     Bridgeport was formed for the purposes of owning, constructing, operating, leasing, financing, contracting with and/or investing in ethanol production and co-product production facilities, as well as engaging in the processing of corn, milo, barley, grains, and other

feedstock into ethanol, and any and all related co-products, as well as to market and sell those products.

25.     Bridgeport focuses on selling high-quality products to consumers.  Bridgeport purchases corn and ferments that corn, through corn starch, into ethanol.  Wet distiller grains are the main co-product by volume that remains after the fermentation process.  Bridgeport sells its ethanol and grain products to various consumers in Nebraska and throughout other markets across the country.

**B.     Bridgeport's Operating Agreement**

26.     Kramer and Plaintiffs signed the Bridgeport Operating Agreement.  A true and correct copy of the Bridgeport Operating Agreement is attached hereto as **Exhibit 1.**

27.     The Bridgeport Operating Agreement describes the purpose of Bridgeport, specifically:

> The nature of the business and purposes of the Company are (i) to own, construct, operate, lease, finance, contract with, and/or invest in ethanol production and coproduct production facilities and (ii) to engage in the processing of corn, milo, barley, grains and other feedstock into ethanol and any and all related co-products, and the marketing of all products and co-products from such processing.

*See* Bridgeport Operating Agreement, Ex. 1, at § 2.3.

28.     The Bridgeport Operating Agreement identifies the Managers and Members of Bridgeport.  There are two "classes" of membership units in Bridgeport, Class A and Class B, with Bridgeport issuing only up to 18 Class A units, and up to 547 Class B units.  The members holding Class A units are permitted to appoint a majority (4 of 7) of the Managers of Bridgeport, and the remaining minority (3 of 7) Managers are appointed by the Class B Members.  *See* Ex. 1, at §§ 3.1.1.1; 3.1.1.2; 7.4.

29.     The Class A-appointed Managers of Bridgeport are Defendant Kramer as well as Bill Bornhoft, Larry Baucke, and Galyn Einspahr.  The Class B-appointed Managers of Bridgeport are Charles (Chuck) Weinreis, Randy Faessler, and Scott Schiff.  These seven individuals comprise the Bridgeport Board.

30.     The Bridgeport Operating Agreements designates a Managing Manager.  *See id.*, at § 7.10.  Since 2007, Kramer has served as the Managing Manager of Bridgeport.

31.     Kramer has the duties and obligations, among others, to discharge his duties pursuant to the Bridgeport Operating Agreement in good faith, in a manner that is in the best interests of Bridgeport, and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances.  Ex. 1, at § 7.18(c).

32.     Kramer also is required to cause Bridgeport to conduct its business and operations separate and apart from the business of any of the Managers.  *Id.* at § 7.18(a).

33.     Kramer is prohibited from, among other things, receipt of an improper financial benefit to which he is not entitled; receipt of distributions in violation of the articles of organization, the Operating Agreement, or Section 7-80-606 of Colorado's Limited Liability Company Act; engaging in a knowing violation of law; or acts or omissions involving fraud, bad faith or willful misconduct.  Ex. 1, at § 7.23.

34.     Section 8.1 of the Bridgeport Operating Agreement provides "[t]he books and records of [Bridgeport] shall be kept, and the financial position and the results of its operations recorded, in accordance with GAAP.  The books and records shall reflect all the Company transactions and shall be appropriate and adequate for [Bridgeport's] business."  Section 8.2 provides, in part, that "any Member or its designated

representative shall have reasonable access to the information and documents kept by [Bridgeport] pursuant to Section 8.1."

**C.**      **CAP**

35.      CAP was founded by Kramer in 2004 to create and supply feed product for feed yards in eastern Colorado and to help produce fuel for use in Colorado.  In 2005, an ethanol plant in Sterling, Colorado opened and began operations, under the name Sterling Ethanol LLC, and CAP began providing management services to that plant.  Over time, CAP expanded its business plan and began providing management services to an ethanol plant in Yuma, Colorado (Yuma Ethanol LLC), and in 2007, to the Bridgeport Plant in Bridgeport, Nebraska.

36.      Since that time, CAP has managed the day-to-day operations of the Bridgeport ethanol and wet distiller grains Plant.  As discussed more fully below, CAP has done so pursuant to a Management Agreement entered into between Bridgeport and CAP dated September 1, 2007 (the "Management Agreement").

37.      Today, CAP oversees total annual ethanol production out of Bridgeport of over 52 million gallons of ethanol per year for Bridgeport, and, among other things, purchases and sells feed on behalf of Bridgeport.

**D.**      **The Management Agreement Between Bridgeport and CAP**

38.      To manage, supervise, and conduct the daily affairs of Bridgeport's Plant, as well as to obtain management and procurement services relating to the purchase of its corn products necessary for its ethanol and wet distiller grains operations, Kramer caused Bridgeport to hire CAP in 2007 to provide Bridgeport with management services.

39.     On September 1, 2007, Bridgeport and CAP entered into a Management

Agreement.  A true and correct copy of the Management Agreement is attached hereto as

**Exhibit 2**.

40.     The recital provisions of the Management Agreement provide the intent and

purpose of the engagement:

> WHEREAS, Company [Bridgeport] intends to construct and operate an ethanol production facility in Bridgeport, Nebraska (the "Plant"); and
>
> WHEREAS, Company wishes to engage Managing Company [CAP], as a contractor, to manage and operate the ethanol production facilities, as well as co-product production, at the Plant, and Managing Company [CAP] desires to provide such management services on the terms and conditions hereinafter described.

41.     The Management Agreement provides for the duties and obligations of CAP as

the manager of Bridgeport's Bridgeport Plant, specifically:

> It is the duty of Managing Company to **cooperate with Company and act in a manner to maximize the long term success and profitability of the Plant**. To this end, **Managing Company agrees to perform in a professional and competent manner** and to act in compliance with all loan covenants, loan agreements, promissory note requirements and any other requirements of any financing documents executed by Company.  **Subject to the ultimate control and policies of the Board**, Managing Company shall have the day-to-day management control of the business of the Plant and shall have the responsibility and authority to take all action necessary or appropriate to accomplish the purposes of the Plant including, without limitation, the power and authority:
>
> (a)     To manage, supervise and conduct the day-to-day affairs of the Plant.
>
> (b)     To hire such employees and independent contractors as Managing Company shall determine are reasonably necessary to the operations of the Plant, **subject to Board approval**. The Board shall retain the authority to require Managing Company to terminate any employees or independent contractors hired by Managing Company. In the case of an emergency, prior approval of the Board will not be required.
>
> (c)     To purchase and have delivered to the Plant on a timely basis all grain required in the operations of Company, which grain shall be

delivered free and clear of any liens or encumbrances of any kind. Company shall pay Managing Company for such grain on a weekly basis at a marketing fee of $0.03 per bushel.

(d)     To market and sell distillers wet grains with solubles ("DWGS") produced at the Plant to local feed yards, dairies and other buyers at a competitive price. On a weekly basis, Company shall pay Managing Company an amount equal to 4% of the gross amount charged to buyers of the DWGS.

(e)     To purchase or otherwise obtain the right to use equipment, supplies, hardware and software technology associated with the Plant, except that new purchases in amounts exceeding $100,000 must be approved in advance by the Board. As used in the preceding sentence, "new purchases" does not refer to equipment, supplies, hardware and software technology associated with the initial construction of the Plant or associated with future expansions of the Plant, or budgeted capital expenditures approved by the Board nor does it refer to repairs to or replacements of the equipment, supplies, hardware and software technology associated with the initial Plant or the expanded Plant.

(f)     To create a projected annual Financial Statement for review by the Board. To maintain adequate records and accounts of all operations and expenditures relating to the operations of the Plant.

(g)     To execute all instruments of any kind or character which Managing Company in its discretion shall deem necessary or appropriate to carry out its duties and responsibilities.

(h)     To establish bank accounts, collect customer payments, disburse cash and make other payments in the name of Company.

(i)     To obtain liability, casualty and other insurance to protect the Plant properties and assets.

(j)     To carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the day-to-day operations of the Plant.

(k)     To maintain, at the expense of Company, adequate records and accounts of all operations and expenditures and furnish Company with monthly and annual statements of account as of the end of each month and year, together with all necessary tax reporting information.

> (l)   **To use its best efforts to cause the Plant and its operations to comply with all applicable laws and regulations.**

Management Agreement, Ex. 2, at § 2 (emphasis added).

42.   The Bridgeport Board retained the ultimate authority and control over CAP's management of the Bridgeport Plant and its General and Plant Managers.  Among other things, CAP agreed to cooperate with Bridgeport, to act in a manner to maximize the long-term success and profitability of the Plant, and to act in a professional and competent manner.  *Id.* at § 2. Further, the day-to-day management by CAP of the business of the Plant, and its authority to take actions to further the purposes of the Plant, were subject to the ultimate control of Bridgeport's Board.  *Id.*

43.   Pursuant to the Management Agreement, CAP is also obligated to provide Bridgeport with full time services of a qualified Bridgeport General Manager to conduct the day-to-day operations of the ethanol-production Plant in Bridgeport, Nebraska.  Specifically, the Management Agreement states:

> Managing Company will provide the full time services of a qualified Plant General Manager acceptable to the Board, whose salary, related payroll taxes and benefits shall be paid by Managing Company without reimbursement by Company. Subject to the ultimate control and policies of the Board, the General Manager's responsibilities include the following:
>
> (a)   To oversee all business operations, Plant operations, purchasing operations, marketing operations, personnel operations, and any and all other items relating to Plant operations and profitability.
>
> (b)   Timely reporting of financial information and operational information to Company.
>
> (c)   To maintain a positive company image and relationship in the city, community, county, state and nation.
>
> (d)   To administer the wage and benefit package recommended by Managing Company and approved by the Board.

17

(e)     To use its best efforts to ensure that all city, county, state and federal rules and regulations are being met. This would include but not be limited to: air quality regulations, storm water discharge regulations, BATF regulations, OSHA regulations, state fuel regulations, state feed regulations, and any and all other regulations pertaining to Plant operations.

(f)     To observe all ethanol related activities of the state and federal legislature and work diligently to retain all current incentives available to the ethanol industry. Also, work with any state or federal legislative effort that is positive to the ethanol industry.

(g)     To approve all Plant purchases involving new items and sign all cheeks and review all invoices on a timely basis. Raw material and replacement purchases may be handled by individual departments.

(h)     To oversee grain purchasing, ethanol marketing and distillers feed marketing departments and to ensure best pricing scenarios for all products.

(i)     To insure that all raw product costs are minimized and that all finished product revenues are maximized.

(j)     To report to Company and Board on a regular basis and as requested.

Ex. 2, at § 11.

44.     In exchange for management services, Bridgeport pays CAP various fees pursuant to the Management Agreement, including a "Management Fee." Specifically:

Company shall pay Managing Company a management fee of $0.00875 per gallon of denatured fuel ethanol production (the "Management Fee") or a minimum of $350,000 per year ($29,166 per month). The Management Fee is payable in monthly installments based on the prior month's production and is due on the first day of the month. The Management Fee and all other fees paid to Managing Company hereunder shall be adjusted (to increase only) annually for inflation on first day of the twelfth month following the execution of this Agreement and o each anniversary of such date, based on the increase, if any, in the Consumer Price Index, CPI-U, U.S. City Average, All Items, from September of the preceding year to September of that year.

*Id.* at § 7.

45.     Bridgeport also pays CAP an "Incentive Fee" as follows:

> As an incentive to Managing Company to achieve high-profitability, and to promote collection of those revenues billed and to encourage quality and efficiency of operation, Company shall, on an annual basis, pay to Managing Company, in addition to the Management Fee, an amount equal to five percent (5%) of EBITDA. Such incentive bonus payments are due and payable no later than 60 days after the end of each fiscal year. Said Incentive Bonus shall be prorated if Managing Company's services terminate during any fiscal year, and shall be due and payable no later than 60 days following the date of such termination of services.

*Id.* at § 8.

46.     Bridgeport further pays CAP a "Marketing Fee" pursuant to the Management Agreement, as set forth above, *see* Ex. 2, at § 2(c), and pursuant to a Wet Distillers Grain Marketing Agreement, as well as a "Purchase Fee" or "Origination Fee" pursuant to its Grain Purchasing Agreement, each as discussed further below.

47.     Since 2007, Bridgeport has paid substantial sums of money to CAP.  Specifically, Bridgeport has paid approximately $33 million in the form of various fees, including Management, Incentive, and Marketing Fees, with more than $16 million of that figure being paid to CAP since 2014.

48.     Bridgeport's business and operations depend heavily on the effective management and oversight of CAP, whom Bridgeport entrusts to act in its best interests in its decision-making relating to Bridgeport and its daily activities. That includes CAP's work in procuring corn for Bridgeport, ensuring that Bridgeport is paying the best, most competitive prices that it can in order to procure that product, and guaranteeing that Bridgeport is operating its business safely, effectively, and efficiently in order to produce the highest quality products at the lowest price.

49.     The Management Agreement allows for the termination of CAP and the fees which Bridgeport pays to CAP for management services.  Ex. 2, at § 16.  However, given

Kramer's roles on behalf of and interests in both Bridgeport and CAP, Defendants have not allowed for, and Bridgeport has not participated in, any meaningful discussion regarding potential termination of CAP or reduction or cessation of fees payable to CAP.  Defendants have further engaged in self-dealing and other wrongdoing by not raising with the Board on an annual basis whether to modify or terminate the Management Agreement, and by failing to provide information to the Board, and specifically to the Class B Board Managers, or to the Bridgeport members including Plaintiffs, that would allow for a meaningful evaluation of CAP's performance and whether or not to terminate the parties' relationship.

E.    **Bridgeport's Other Agreements With CAP**

50.    Bridgeport also entered into a Wet Distillers Grain Marketing Agreement with CAP, dated September 1, 2007, for the purposes of CAP marketing all wet distillers grains produced by Bridgeport's Plant in Bridgeport, Nebraska.  A true and accurate copy of the Wet Distillers Grain Marketing Agreement is attached hereto as **Exhibit 3**.  In exchange for CAP's services to market and transport those grains, Bridgeport agreed to pay CAP four percent (4%) of the net price for the wet distiller's grains produced by Bridgeport as a "Marketing Fee."

51.    Bridgeport also entered into a Grain Purchasing Agreement with CAP, dated September 1, 2007, for the purposes of having CAP purchase all grains used by the Bridgeport Plant for the production of ethanol.  A true and accurate copy of the Grain Purchasing Agreement is attached hereto as **Exhibit 4**.  Specifically, CAP agreed to purchase and deliver to the Bridgeport Plant all of the grains used by Bridgeport in its Plant operations for a period of sixty (60) months.  Bridgeport was obligated to purchase all grains used by the Plant only through CAP and pursuant to the Agreement.  In exchange for CAP's work, Bridgeport paid

CAP three cents ($0.03) per bushel of corn or grains purchased by Bridgeport's use at the Plant (the "Purchase Fee").

**F.**     **Defendants' Wrongdoing**

52.     Kramer, individually and through CAP and John and Jane Does Nos. 1-25, engaged in a concerted effort of wrongdoing.

**1.**     **Kramer's Repeated Improper Use of Funds and Resources**

53.     Kramer, individually and through CAP and John and Jane Does Nos. 1-25, used funds that otherwise would have been distributed to Plaintiffs for his personal benefit and for the benefit of his other companies and interests.

54.     As examples only:

(a)     Kramer purchased and used machinery and equipment for his personal use before subsequently requiring Bridgeport to purchase such equipment from him.  For example, Kramer would require Bridgeport's General Manager, Ted Free, to approve invoices for Bridgeport to purchase such depreciated equipment, even over Mr. Free's protest, including that Bridgeport did not need such equipment.

(b)     Kramer sought out and obtained for his racing team(s) memberships in and sponsorships from Growth Energy, a national ethanol trade association.  Kramer required Bridgeport to reimburse him personally for these memberships and associated sponsorships, and did not seek or obtain Bridgeport Board consent for these repeated expenses.  Kramer's name appeared on invoices he issued to Bridgeport for these expenses, and forced Mr. Free to approve, and then at some point, Kramer switched to reflecting his son's name, Deric Kramer, on these invoices.

(c)      Kramer required Bridgeport to endorse various checks, paid by supplier Poet Ethanol to Bridgeport, over to Kramer's personal Sterling Racing Team.

(d)      Kramer required Bridgeport to pay for wrappings, vehicle graphics and decals, and other advertising or promotional products relating to Kramer's personal racing teams or those in which he had interests.  One such example relates to Kramer requiring Bridgeport to pay such expenses to Fineline Racing.

(e)      Bandimere Speedway in Morrison, Colorado, invoiced Kramer and his entity American Ethanol for sponsorships relating to Kramer's racing teams.  Kramer would then require Bridgeport to pay for those sponsorships.

(f)      Kramer required Bridgeport to pay for American Ethanol Racing's and Sterling Ethanol Racing's dues and memberships with NASCAR.

(g)      Kramer advertised his company and racing entity Sterling Ethanol Racing at the Julesburg Drag Strip.  When invoiced by Julesburg Drag Strip, Kramer required Bridgeport to pay those invoices.

(h)      Kramer attempted to leverage Bridgeport for the benefit of CAP's other managed entities, the Sterling and Yuma ethanol plants, over which Kramer also served as General Manager and provided oversight.  As an example, upon information and belief, Kramer became upset with Bridgeport given the distinction of being among the safest ethanol production plants in America for several years in a row, and desired for Sterling and Yuma to be similarly recognized.  Accordingly, Kramer engaged in various conduct, to the detriment of Bridgeport's Plant, in an effort to obtain higher safety distinctions for the Sterling and Yuma plants.

(i)      Kramer instructed that the Sterling and Yuma plants trade parts and
equipment with the Bridgeport Plant, to Bridgeport's detriment.  As one example,
Bridgeport would obtain and purchase new parts and units for its own use at the
Bridgeport Plant, such as Natural Gas Odorizers and heat exchangers, and Kramer would
direct that those new parts and units be provided to the Sterling and Yuma plants, without
fair payment or value to Bridgeport, or in exchange for used or refurbished parts.

55.      Kramer and CAP frequently refused to explain or discuss Bridgeport's financials,
and decisions which related to Bridgeport's finances, with Plaintiffs.  Among other things,
Plaintiffs, as members of and investors in Bridgeport, are entitled to information regarding
Bridgeport's financial affairs and Defendants' decisions relating to those finances, including
pursuant to terms in the Bridgeport's Operating Agreement and under Colorado's Limited
Liability Company Act.  *See, e.g.*, C.R.S. § 7-80-408 (regarding access to books and records,
providing that each member of a limited liability company has the right to inspect and copy
certain records of the company upon reasonable demand for any purpose reasonably related to
the member's interest as a member of the company, including but not limited to the true and full
information regarding the business and financial condition of the company, including written
resolutions and minutes, a formal accounting of the company's affairs, and any other information
regarding the affairs of the company as is just and reasonable).

56.      The repeated wrongdoing by Kramer, including in collaboration with CAP and
John and Jane Does Nos. 1-25, over a period of many years, was in violation of Bridgeport's
Operating Agreement, including but not limited to Section 7.23 which imposes liability on
Kramer as the Managing Manager of Bridgeport for receipt of any improper financial or other

benefit to which the Manager is not entitled, and for violations of law, or acts or commissions involving fraud, bad faith or willful misconduct.

57.     In addition, upon information and belief, Defendants have refused to provide Plaintiffs with full and fair access to and accounting of Defendants' financial and management decisions relating to Bridgeport, in violation of the relevant agreements and applicable law, and in an attempt to conceal the wrongful conduct, including acts of self-dealing, of Kramer individually and through CAP.

### 2.     The Scheme to Obtain Sponsorships for Kramer's Racing Teams

58.     Plaintiffs have learned that Kramer, individually and through CAP and John and Jane Does Nos. 1-25, orchestrated a scheme to set up *quid pro quo* arrangements, in order to obtain lucrative sponsorships from Bridgeport's suppliers for Kramer's racing teams.

59.     Specifically, Kramer, in collaboration with CAP and John and Jane Does Nos. 1-25, caused Bridgeport to pay inflated prices for corn and enzymes or other products for Bridgeport's ethanol-production operations, which proceeds otherwise would be distributed in part to Plaintiffs.

60.     This scheme included arrangements with many of Bridgeport's product suppliers, including but not limited to Novozymes Bioenergy Company, Kinect Energy, Growth Energy, Poet Ethanol, and Phibro, and/or their individual subsidiaries or affiliates, and others.  Under these arrangements and at the instruction of Kramer, individually and through CAP and John and Jane Does Nos. 1-25, Kramer set up agreements with these and other companies under which Bridgeport would pay above-market rates for product, and in exchange, the supplier company

would pay or provide Kramer or Kramer's personal racing teams various sponsorships, outside of Bridgeport.

61.     Plaintiffs have learned that Bridgeport's General Manager, Ted Free, began to discover and become concerned about these arrangements and the prices Bridgeport was paying for products.  After investigating these issues, Mr. Free began trying to raise his concerns to Kramer and others regarding the high prices Bridgeport was paying for products with its suppliers.

62.     Kramer, in collaboration with CAP and John and Jane Does Nos. 1-25, attempted to stymie and block Mr. Free's inquiries into these matters.  For example, during a trip sponsored by Novazymes Bioenergy Company, Kramer began to try to "strongarm" Mr. Free to stop looking into these issues or inquiring with Bridgeport's suppliers about their sponsorship arrangements with Kramer's racing teams.  Among other things, Kramer challenged Mr. Free and told him to stop, or else.  Kramer also sent explicit text messages and photos to Mr. Free's wife.

63.     After Mr. Free continued to look into these issues, he received an email from a representative of one of Bridgeport's suppliers, Novozymes Bioenergy, which confirmed Mr. Free's concerns about Kramer's sponsorship arrangements using Bridgeport.  Patrick Denton, a Strategic Account & Marketing Manager at Novozymes Bioenergy -- with whom Bridgeport was under contract to purchase products -- sent an email to Mr. Free regarding Bridgeport's contract. Mr. Denton stated that that he inadvertently and mistakenly sent Mr. Free a copy of the "Kramer Racing American Ethanol NHRA ProStock Sponsorship" agreement between Novozymes North America and Bridgeport (along with Sterling Ethanol, LLC and Yuma Ethanol, LLC) which

related to the sponsorship (the "Kramer Racing Sponsorship Agreement").  Mr. Denton noted

that the Kramer Racing Sponsorship Agreement was the last page of the document, and asked

that Mr. Free immediately discard it and keep it confidential.

64.     Mr. Free, as Bridgeport's General Manager in charge of its operations, was not

aware of any arrangement relating to Novozymes sponsoring Kramer's personal racing teams in

exchange for Bridgeport spending certain amounts of money with Novozymes.  Kramer had

never told Mr. Free, the Bridgeport Board, or the Plaintiffs about such sponsorships before, and

neither Mr. Free nor the Bridgeport Board had approved of this relationship or the Kramer

Racing Sponsorship Agreement.

65.     The Kramer Racing Sponsorship Agreement was signed by Kramer, as the

President and Chairman of the Board of Bridgeport, as well as in his role as the Owner of

Kramer Racing.  A true and correct copy of Bridgeport's Enzyme & Yeast Supply Agreement

with Novozymes North America, containing the Kramer Racing Sponsorship Agreement, is

attached as **Exhibit 5**.

66.     Pursuant to the Kramer Racing Sponsorship Agreement, Novozymes agreed to

sponsor the Kramer's American Ethanol #52 Kramer NHRA ProStock Drag Racing team for five

(5) years (from 2018 through 2023) and, depending on how much Bridgeport spent with

Novozymes to purchase enzyme products for its ethanol-production operations, Novozymes

would provide sponsorship at different levels to the racing team.  Novozymes would do so

through a "product credit" issued to Bridgeport.  The total sponsorship would range between

$225,000 and $400,000, paid as quarterly credits.  *See* Ex. 5.

67.     As another example, Kramer used Bridgeport to obtain lucrative sponsorships for his racing teams from another supplier, Lallemand, which provided Bridgeport with yeast for its ethanol-production operations.  Kramer knew that Bridgeport was paying Lallemand significantly more for yeast products than it would to other market suppliers for comparable product, in exchange for these sponsorships.  Following a trial of another supplier's product, and his looking into what Bridgeport was paying for its yeast products with Lallemand, Mr. Free came to learn that Bridgeport was paying approximately $650,000 more per year than it should have been, and that the Sterling and Yuma plants were each paying approximately the same.  Mr. Free raised this issue with Kramer, intending to have Bridgeport switch to the lower-cost supplier.  Rather than thank Mr. Free for discovering these "overpayments" which would save Bridgeport significantly, Kramer instead, in an effort to further protect the sponsorships for his racing teams, spoke briefly with a Lallemand executive and reported to Mr. Free that Kramer had "fixed" the problem, and that Lallemand would now significantly discount, by approximately $650,000, the amount it had been charging to Bridgeport for its yeast product.

68.     As another example, Kramer leveraged a sponsorship for his racing teams from a software company, Direct Automation, which Bridgeport had engaged to update certain of its software.  Kramer negotiated the contract and amount that Bridgeport would pay to Direct Automation, which Mr. Free and others came to learn was approximately $60,000 more than it should have been, and was paid in exchange for Direct Automation's purchase of "stickers," to appear as sponsorships on Kramer's racing cars.

69.     Following his receipt of this information, Mr. Free raised the issue and tried to further discuss his concerns with Kramer and others.  Kramer shut down these concerns and told

Mr. Free to "stay in his lane" or words to that effect, and instructed Mr. Free that Bridgeport

would continue to pay higher prices so that Kramer and his racing teams would continue to

receive the Kramer Racing Sponsorship and other sponsorships.

70.     Upon information and belief, at the direction of Kramer, in collaboration with

CAP, Bridgeport entered into similar sponsorship agreements with multiple additional suppliers.

Among other things, Kramer's racing teams displayed logos, graphics, and decals on their race

cars and other gear which displayed the names and information of additional supplier sponsors.

### 3.     Self-Dealing by Kramer Individually and Through CAP and John and Jane Does Nos. 1-25

71.     Kramer engaged in other self-dealing conduct relating to Bridgeport.  As one

example, Kramer became aware of certain interests in Bridgeport which a seller intended to

make available.  Instead of following the terms of the Operating Agreement, which allow

Bridgeport and then Plaintiffs and others a right of first refusal relating to those interests, Kramer

engaged in self-serving conduct to facilitate the sale and purchase of those interests not to the

company, but to himself and to other of his associates, including to certain members of

Bridgeport who were associated with Kramer.  Among other conduct, Kramer did not

meaningfully communicate with the Board about these interests, and did not obtain a bona fide

offer relating to these interests from the third-party purchasers, defined under the Operating

Agreement to include other Equity Owners of Bridgeport.  *See* Ex. 1, at § 10.4.  Rather, Kramer

took the total amount of the sale and divided it up by twelve shares among himself and his

associates.  In doing so, Kramer failed to disclose that he subsequently would be voting for

Bridgeport to make a meaningful distribution to its members, including on these interests.

72.     Thereafter, upon information and belief, Kramer, individually and through CAP and John and Jane Does Nos. 1-25, caused certain corporate actions to be taken so that the Kramer associates now owning these interests -- including Bornhoft Family Investment Group, C Triple E Energy, Five Aces LLC, JJLB LLC, and Kramer Energy Bridgeport -- received a substantial distribution with respect to them.  Kramer's conduct violated provisions of the Bridgeport Operating Agreement, including but not limited to Section 10 governing transfers of ownership interests in Bridgeport.

73.     As another example of Kramer's self-dealing, individually or through CAP and John and Jane Does Nos. 1-25, Kramer hired family members to be in charge of important compliance issues relating to the Bridgeport Plant, including but not limited to managing compliance related to the Plant's carbon credit scores, which are critical to Bridgeport's ability to market and sell product in certain states, including California.  Upon information and belief, this has led to mixing and matching of carbon scores from Bridgeport and the other plants under Kramer and CAP's control, Sterling and Yuma, to the detriment of Bridgeport, in order to allow the Sterling and Yuma plants to obtain higher carbon credit scores and access to other markets. In addition, upon information and belief, Kramer leveraged his scheme to obtain sponsorships for his racing teams from Bridgeport's suppliers, as described above, to pay his son to drive race cars for those racing teams.

74.     As a further example, Plaintiffs have come to learn that the funds Bridgeport kept in reserve in a bank account received a lower, less advantageous interest rate than those which were enjoyed by the Sterling and Yuma plants on the funds which they kept in reserve.  Upon information and belief, Kramer negotiated higher, more attractive interest rates with the bank for

the Sterling and Yuma plants, but did not do so for Bridgeport.  That resulted in significant lost

interest for Bridgeport on these funds.  Upon information and belief, Kramer previously

instructed Mr. Free not to contact the bank or inquire into the interest rates relating to

Bridgeport's reserve funds held at the bank.

### 4.       **The Wrongful Conduct with Respect to Mr. Free**

75.     As set forth herein, Kramer, individually and through CAP and John and Jane

Does Nos. 1-25, took actions which further harmed Plaintiffs by restricting and preventing

Bridgeport's General Manager, Mr. Free, whom had been appointed to oversee Bridgeport's

daily operations, from performing his required job duties and functions as set forth in the

Management Agreement.  *See* Ex. 2, at §§ 11(G) and 11(H).

76.     As examples only, during this period Kramer, individually and through CAP and

John and Jane Does Nos. 1-25:

(a)     Continued to ignore Mr. Free's concerns about Kramer's wrongdoing,

including, but not limited to, the impropriety of Kramer's racing sponsorships;

(b)     Threatened Mr. Free to coerce him into not disclosing Kramer's

wrongdoing and the Kramer racing sponsorships, and to accept Kramer's choices for

Bridgeport's suppliers given that Kramer's racing sponsorships were tied directly to the

size and dollar amounts of orders relating to those suppliers;

(c)     Instructed Mr. Free to not disclose information about Kramer's

wrongdoing;

(d)     Appointed himself "Operations Director" of the Bridgeport Plant, making

himself, among other things, in charge of certain operational decisions such as selecting

products for Bridgeport's ethanol production operations.  Kramer did so to further limit

Mr. Free's participation in and knowledge of the Plant's operations, and to hide his

conduct from Mr. Free; and

(e)     Caused attorney Ronald Brotzman on June 29, 2020, to notify Mr. Free

that his employment agreement as the General Manager of Bridgeport, dated February 1,

2009, was terminated effective 180 days later and that Mr. Free's employment would

continue, now only "at will," with CAP having the ability to terminate his employment at

any time for any reason, with or without notice.

77.     Kramer's actions prevented or restricted Mr. Free's abilities to perform his duties

and obligations and were in violation of the Operating Agreement and/or applicable laws.

78.     Despite Kramer's wrongful conduct, Mr. Free continued to perform various

studies and analyses regarding the pricing that Bridgeport's suppliers were providing to

Bridgeport, relating to Mr. Free's concerns regarding Kramer's sponsorship arrangements and

other wrongdoing.

79.     In advance of a Bridgeport Board meeting scheduled to occur on May 25, 2021,

Mr. Free submitted documents and information to the Bridgeport Board Controller, Greg Carrier,

on or about May 18, 2021, requesting that the documents and information be included in the

package sent to the Bridgeport Board in advance of the May 25, 2021 meeting, and to help

facilitate a presentation on his findings that Mr. Free wanted to give to the Board during the

meeting.

80.     Kramer, however, became aware of Mr. Free's intent to present this information to the Board and instructed Mr. Carrier to remove this information from the package of materials that would be sent to the Bridgeport Board.

81.     The next day, on May 19, 2021, Kramer terminated Mr. Free from his position as Bridgeport's General Manager and his employment agreement with CAP.  As such, Mr. Free would not be able to present his findings to the Bridgeport Board.

82.     Upon information and belief, Mr. Free was invited to a restaurant under auspices of having a meal with Kramer, but was met by Kramer and his attorney, and apparently upon feeling ambushed by the situation, Mr. Free left the restaurant.  Kramer contacted the police and made a police incident report that resulted in a multi-county, multi-jurisdictional manhunt for Mr. Free, who Kramer apparently reported was armed, distraught, and driving a stolen vehicle. Mr. Free was only informed of his termination later, after leaving the restaurant.

83.     On May 24, 2021, one week *after* Mr. Free had been terminated, Kramer sent an email to the Bridgeport Board.  The email stated:

> Effective Wednesday, May 19, 2021, Ted Free is no longer employed by Colorado Agri Products ("CAP") and correspondingly, he will no longer perform services of General Manager ("GM") of Bridgeport Ethanol.  This is a CAP personnel matter. Please understand that we are not at liberty to discuss the specifics of his separation. We want you to know CAP will continue to provide General Manager services to Bridgeport Ethanol and moving forward we have a recruiting company engaged to assist us in finding a new GM. Additionally, I have talked to a few other interested prospects. We hope to have a replacement targeted within the next month.  In the meantime, Greg, Calvin and I will be running the operations until a replacement is found.

84.     Kramer provided no meaningful opportunity for the Bridgeport Board to learn of any concerns Kramer had with Mr. Free, to have any advance notice of termination, or input into

the termination. Kramer provided no meaningful reasons for why Mr. Free was terminated, either before or after the termination.

85.     Subsequently, in or around September 2021, Kramer, individually and through CAP and John and Jane Does Nos. 1-25, hired Trevor Morgan as the new General Manager for Bridgeport to operate the Bridgeport Plant, who was a former associate of Kramer's who worked at Novozymes and Phibro, two of Kramer's racing team sponsors. Kramer gave Plaintiffs and the Board no meaningful advanced notice, and no opportunity to review or comment on the hiring of Mr. Morgan, or opportunity to interview or identify other potential candidates. The hiring of Mr. Morgan, and Kramer's conduct surrounding it, is yet another conflict of interest and wrongful conduct under the Bridgeport Operating Agreement and applicable laws.

### 5.     The Wrongful Conduct with Respect to Bridgeport's Plant

86.     In addition, Defendants have engaged in additional wrongful conduct relating to the Bridgeport Plant, which, among other things, has had negative effects on Bridgeport, its members and interest holders, and its personnel working at the Plant.

87.     For example, Plaintiffs have recently received complaints from Bridgeport Plant employees regarding Mr. Morgan's conduct as the new General Manager of the Plant, including his management of operations of the Plant on behalf of CAP and at the instruction of Kramer. Among other complaints, Bridgeport personnel report that they are concerned about the direction of the Plant under Mr. Morgan, and even are fearful for their jobs.

88.     Among other conduct, Bridgeport personnel have recently reported that Mr. Morgan, at the instruction of Kramer and/or CAP, has requested that Bridgeport's Plant Manager dispose of excess water and byproducts from the Bridgeport Plant's operations in potentially

improper ways or without the proper clearances from applicable government authorities.
Bridgeport's Plant Manager expressed his concerns and reservations about doing so, and
reported this issue to certain of Plaintiffs' representatives, concerned that he would be viewed as
potentially responsible for any potential misconduct.

89.     Defendants' conduct has had a negative impact on Bridgeport and Plaintiffs'
interests, including, among other things, putting distributions at risk, and effecting the Plant's
daily operations, the morale of its personnel, and performance.  These actions may also subject
Bridgeport to heightened scrutiny from regulatory authorities.

**G.**     **Plaintiffs are Entitled to Recover Damages from Defendants**

90.     As a result of Defendants' wrongful conduct, Plaintiffs have suffered substantial
damages.  These damages include, but are not limited to, lost distributions, substantial lost and
impaired value of Plaintiffs' business, and recovery from Defendants of their ill-gotten gains.
Plaintiffs have been damaged in an amount well in excess of $75,000.00, exclusive of moratory
interest and costs, which cannot be reclaimed or rebuilt in any reasonable timeframe.

### IV.  Claims for Relief

**First Claim for Relief**
**Breach of Operating Agreement – Damages**
**(Plaintiffs against Defendants)**

91.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth
herein.

92.     Plaintiffs and Defendants are subject to the terms of the Operating Agreement,
including but not limited to the term implied by law that imposes a duty of good faith and fair
dealing upon Defendants in their conduct.

93.     Plaintiffs performed under the Operating Agreement.

94.     Defendants' actions materially breached the Operating Agreement, including but not limited to their duties of good faith and fair dealing in their conduct.

95.     Plaintiffs have suffered and will suffer damages as a result of Defendants' breaches of the Operating Agreement and the implied covenant of good faith and fair dealing in an amount to be shown at trial.

## Second Claim for Relief
### Accounting and Access to Books and Records
### (Plaintiffs against Defendants)

96.     Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

97.     Plaintiffs have the right to an accounting and access to books and records as to the affairs of Defendants with respect to Bridgeport.

98.     The grounds for Plaintiffs to have the right to an accounting and access to books and records include, but are not limited to, the following:

a.     As set forth in this Complaint, Plaintiffs have been wrongfully excluded from Bridgeport's business or possession of their rights and property by Defendants.

b.     The terms of the Operating Agreement provide that each member shall have at all times access to the books and records of Bridgeport.

c.     Section 7-80-408, C.R.S., for the reasons set forth in this Complaint, requires that Defendants account to Plaintiffs.

d.     As set forth in this Complaint, other circumstances render a formal accounting just and reasonable.

99.     Plaintiffs are entitled to a formal accounting as well as access to books and records from Defendants and Bridgeport.

## V.  **Demand for Judgment**

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants on all Claims for Relief for damages in an amount to be proved at trial, as well as appropriate declaratory judgments concerning Plaintiffs' rights and Defendants' duties and obligations arising in connection with Bridgeport, without limitation, the relief below:

A.      As to the First Claim for Relief, against Defendants, for damages in an amount to be shown at trial.

B.      As to the Second Claim for Relief, against Defendants, for an accounting and access to books and records as to the affairs of Defendants with respect to Bridgeport.

C.      As to all Claims for Relief, for attorneys' fees and costs, expert witness fees, pre-judgment and post-judgment interest as allowed by the parties' agreements and/or by law, and for such further relief as the Court deems just and proper.

## VI.  **Jury Demand**

Plaintiffs demand a jury trial on all issues so triable.

DATED:  November 19, 2021.

SHERMAN & HOWARD L.L.C.

*s/ Peter G. Koclanes*
Peter G. Koclanes

*s/ Nicholas M. DeWeese*
Nicholas M. DeWeese

633 17th Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
Email:  pkoclanes@shermanhoward.com
          ndeweese@shermanhoward.com

*ATTORNEYS FOR PLAINTIFFS*

Plaintiffs' Addresses:

Weinreis Ethanol LLC
16420 53rd Street, SW
Golva, ND  58632

Dinklage Feed Yard Inc.
10152 Road 20
Sidney, NE  69162

Lapaseotes Land LLC
West Highway 26 Box 423
Bridgeport, NE  69336

East Coast Ag Holdings LLC
16054 South DuPont Highway
Harrington, DE 19952