IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03120-CMA-NRN

WEINREIS ETHANOL, LLC, a North Dakota limited liability company;
LAPASEOTES LAND LLC, a Nebraska limited liability company;
DINKLAGE FEED YARD, INC., a Nebraska corporation; and
EAST COAST AG HOLDINGS LLC, a Delaware limited liability company,

Plaintiffs,

v.

DAVID KRAMER;
WILLIAM BORNHOFT;
COLORADO AGRI PRODUCTS, LLC, a Colorado limited liability company; and
JOHN AND JANE DOES NOS. 1-25,

Defendants.

**REPORT AND RECOMMENDATION ON
DEFENDANTS KRAMER AND COLORADO AGRI PRODUCTS, LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (Dkt. #66)
AND
DEFENDANT BORNHOFT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT (Dkt. #84)**

**N. Reid Neureiter
United States Magistrate Judge**

This matter is before the Court upon Orders (Dkt. ##68, 85) entered by Judge Christine M. Arguello referring Defendants Kramer and Colorado Agri Products, LLC's ("CAP") Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. #66) and Defendant Bornhoft's Motion to Dismiss Plaintiffs' First Amended Complaint. Dkt. #84.

Defendants Kramer and CAP filed their motion to dismiss on August 2, 2022. Dkt. #66. Plaintiff responded to this motion on September 9, 2022 (Dkt. #81), and

Defendants Kramer and CAP replied in support of their motion on September 23, 2022. Dkt. #83.

Defendant Bornhoft filed his motion to dismiss on September 27, 2022. Dkt. #84. Plaintiffs responded to Defendant Bornhoft's motion to dismiss on October 18, 2022 (Dkt. #91), and Bornhoft filed his reply in support on November 1, 2022. Dkt. #97.

The Court heard oral argument on both motions on November 16, 2022. *See* Dkt. #111. The Court has taken judicial notice of the docket and considered the applicable Federal Rules of Civil Procedure and case law. Now, being fully informed and for the reasons discussed below, the Court **RECOMMENDS** that the subject motions be **GRANTED IN PART AND DENIED IN PART.**

## BACKGROUND[1]

This is a complex commercial dispute with an extensive cast of characters. Bridgeport Ethanol, LLC ("Bridgeport"), a non-party, produces ethanol and distills wet grains. Dkt. #59 at 2, ¶ 2. Through the purchasing and processing of corn, Bridgeport manufactures ethanol and sells its products to purchasers of ethanol and grains throughout Nebraska and across the county. *Id.* Plaintiffs are members of and investors in Bridgeport. *Id.* at 3, ¶ 5.[2]

Since 2007, CAP has served as the sole management company and commodities marketer for Bridgeport. CAP provides "management and oversight to

---

[1] Allegations in this section are taken from Plaintiffs' First Amended Complaint, filed August 2, 2022. Dkt. #59. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

[2] As discussed during oral argument, Bridgeport has other shareholders who are not Plaintiffs in this suit.

Bridgeport as well as two other ethanol production companies, Sterling Ethanol LLC and Yuma Ethanol, LLC,[3] each having ethanol plants located here in Colorado." *Id.* at 2, ¶ 3. The Management Agreement between Bridgeport and CAP is attached to the First Amended Complaint as Exhibit 2.

Defendants Kramer and Bornhoft are the co-founders and co-owners of CAP. Kramer serves as the General Manager of CAP and, pursuant to the Bridgeport Operating Agreement (attached as Exhibit 1 to Dkt. #59), also serves as the Managing Manager of Bridgeport. *Id.* at 2–3, ¶ 4. Kramer and Bornhoft are two of the four Class A Managers of Bridgeport's Board of Managers. According to Plaintiffs, Kramer and Bornhoft exercise significant control over Bridgeport, including directing decisions about daily operations. *Id.*

Plaintiffs raise a litany of complaints against Defendants, but the crux of this suit is that Kramer and Bornhoft, individually and through CAP, improperly diverted Bridgeport's profits that otherwise would have been distributed to Plaintiffs. Plaintiffs allege that Kramer, in collaboration with Bornhoft, took Bridgeport funds for his "own use and/or used such funds to pay for or reimburse dues, fees, marketing and advertising, and sponsorship expenses for his personal race car teams or those in which he has interests, including American Ethanol Racing Team, Sterling Racing Team, Kramer Racing American Ethanol NHRA ProStock Team, and Deric Kramer Pro Stock Racing Team."[4] *Id.* at 3, ¶ 5. Further, Defendants allegedly paid "inflated, over-market prices to various enzyme and product suppliers, from whom Bridgeport purchased enzymes and

---

[3] Sterling Ethanol, LLC and Yuma Ethanol, LLC are not parties to this case.
[4] Deric Kramer is David Kramer's son.

3

other products to produce ethanol." *Id.* at 4, ¶ 6. In exchange for Bridgeport paying the inflated prices to the suppliers, the suppliers agreed to sponsor Kramer's personal racing teams. *Id.*

As part of their concealment of this scheme from Plaintiffs, Defendants terminated Bridgeport's General Manager, Ted Free, after Kramer learned that Mr. Free was questioning the sponsorship arrangements and intended to report his findings to the Bridgeport Board. *Id.*, ¶ 7. Then, Defendants hired a new General Manager, Trevor Morgan, without seeking or obtaining the Bridgeport Board's approval. *Id.* at 5, ¶ 9. Prior to his employment at Bridgeport, Mr. Morgan worked for two of Bridgeport's suppliers who were both sponsors of Kramer's racing teams. *Id.*

Plaintiffs further allege that Kramer:

- personally purchased machinery and equipment for his personal use and then required Bridgeport to purchase the equipment from him, even though Bridgeport did not need such equipment;

- required Bridgeport to reimburse him for his racing teams' memberships and sponsorships;

- did not seek consent from Bridgeport for the racing teams' memberships and sponsorship expenses in the first instance;

- required Bridgeport to pay for wrappings, vehicle graphics, and other promotional expenses relating to his personal racing teams or those in which he had an interest;

- purchased new equipment for Bridgeport, but then would require Bridgeport trade the new equipment with the Sterling Ethanol, LLC and Yuma Ethanol, LLC plants (which CAP also manages but are separate from Bridgeport), without payment or value to Bridgeport, or in exchange for used or refurbished parts; and

- refused to explain or discuss Bridgeport's financials with Plaintiffs.

*See id.* at 23–26, ¶¶ 54–58.

4

Based on the foregoing allegations, Plaintiffs assert six claims for relief: breach of Operating Agreement (against Kramer and Bornhoft); intentional interference with existing and prospective business and contractual relations (against CAP and Doe Defendants); breach of fiduciary duties (against Kramer and Bornhoft), aiding and abetting breach of fiduciary duties (against Bornhoft, CAP, and Doe Defendants), civil theft (against Kramer and Bornhoft), and a claim for access to books and records (against all Defendants).

Kramer, CAP, and Bornhoft move for dismissal of all claims against them except for the claim for an accounting.[5]

First, they argue that the damages claims fail because the financial harms alleged were suffered by the corporation, not Plaintiffs, and therefore must be brought as a derivative action. Defendants further argue that Plaintiffs' third and fourth claims—which allege breach of fiduciary duties and aiding and abetting such breach—fail because all duties not expressly set forth in the Bridgeport Operating Agreement have been disclaimed, so no other duties and specifically, no fiduciary duties, are owed. Finally, Defendants argue that the civil theft claim fails because Plaintiffs do not have a proprietary interest in undeclared distributions, and because Plaintiffs have failed to plead that Mr. Kramer or Mr. Bornhoft took property by theft, robbery, or burglary.

The Court addresses each of these arguments in turn.

---

[5] Though Bornhoft filed a separate motion to dismiss from Kramer and CAP, his motion is nearly identical. Therefore, the Court considers them together.

5

**LEGAL STANDARD**

Rule 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*, 935 F.2d at 1198. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir.

1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

## ANALYSIS

### I. Plaintiffs can bring direct, rather than (or in addition to) derivative claims.

Defendants first argue that Plaintiffs' claims, except for the claim for an accounting, fail because Defendants alleged conduct that resulted in harm to the corporation rather than to the individual Plaintiff-shareholders, so the claims are derivative (rather than direct) under Fed. R. Civ. P. 23.1. The Court is not persuaded.

Generally, "a corporate shareholder may not bring a direct action against a director or other third party whose action causes harm to the corporation. Instead, either the corporation itself, or a shareholder acting on behalf of the corporation in a derivative action under C.R.C.P. 23.1, must pursue such a claim." *Tisch v. Tisch*, 439 P.3d 89, 103 (Colo. App. 2019). However, in limited circumstances, "a shareholder may bring a personal action against a corporation where the shareholder has sustained an injury separate and distinct from that of the corporation or the other shareholders." *Id.* "The distinction between derivative and direct claims turns primarily on whether the breach of

7

duty is to the corporation or to the shareholder(s) and whether it is the corporation or the shareholder(s) that should appropriately receive relief." *Tisch*, 439 P.3d at 105 (citing *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 605 (2d Cir. 1994)). "Particularly for closely held corporations, it is important for the fact finder to determine whether diverted funds are actually distributions, because if only a derivative suit is permitted, the damages recovered simply revert to the wrongdoer." *Id.* (citing *Lynch v. Patterson*, 701 P.2d 1126, 1130 (Wyo. 1985)).

Thus, to bring a direct (individual) claim, a shareholder must allege an individual harm independent of the harm suffered by the corporation. *See generally id.*; *see also Pernick v. Computershare Tr. Co., Inc.*, 136 F. Supp. 3d 1247, 1259 (D. Colo. 2015) ("For a plaintiff to have standing to bring an individual action, he must be injured directly or independently of the corporation." (quoting *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988))). The direct injury alleged must be more than simply diminution in the value of shares, which is an indirect harm. *Pernick*, 136 F. Supp. 3d at 1259.

At this early stage, the Court finds that Plaintiffs have plausibly alleged individual harms sufficient to state direct, rather than derivative, claims because they have alleged an individual, proprietary interest in distributions. The Colorado Court of Appeals decision in *Tisch* is directly on point.

In *Tisch*, Daniel and Eva Tisch ("Tisch siblings") brought individual and derivative claims against their brother, Gary Tisch ("Gary"), for misappropriating corporate profits from their closely held corporation, Liquor Barn, and diverting the profits to himself and his other businesses. The Colorado Court of Appeals considered whether: (1) "corporate profits, not formally declared as distributions but used by the controlling

shareholder for personal and other business matters," could be found by a fact finder to constitute distributions to which minority shareholders are entitled; and (2) "undeclared distributions provide a basis for a minority shareholder to bring an *individual* claim for civil theft against the majority shareholder." *Tisch*, 439 P.3d at 95 (emphasis added). The court answered both questions in the affirmative.

> When discussing the civil theft claim, the Court of Appeals found that
>
> once a dividend is declared, a shareholder has the right to that money in his or her individual capacity. *Erdman v. Yolles*, 62 Mich. App. 594, 233 N.W.2d 667, 669 (1975); *see Cowin v. Bresler*, 741 F.2d 410, 415 (D.C. Cir. 1984) ("Wrongful withholding of dividends, for example, gives rise to an individual cause of action. ... Because dividends are an incident of stock ownership, an action to compel the payment of dividends will not inure to the benefit of the corporation...."); 12B *Fletcher Cyclopedia of the Law of Corporations* § 5922, Westlaw (database updated Sept. 2018) ("A shareholder may sue the corporation or its officers to recover a dividend after it has been declared, since the shareholder then has a right to the money in an individual capacity."). But what is a shareholder's interest in corporate profits misappropriated by a person who could have declared a distribution?
>
> Of course, a corporate shareholder may not bring a direct action against a director or other third party whose action causes harm to the corporation. Instead, either the corporation itself, or a shareholder acting on behalf of the corporation in a derivative action under C.R.C.P. 23.1, must pursue such a claim. *See Box v. Roberts*, 112 Colo. 234, 238, 148 P.2d 810, 812 (1944); *River Mgmt. Corp. v. Lodge Props. Inc.*, 829 P.2d 398, 403 (Colo. App. 1991). Still, in limited circumstances, a shareholder may bring a personal action against a corporation where the shareholder has sustained an injury separate and distinct from that of the corporation or the other shareholders. For example, a division of this court implicitly recognized that a breach of fiduciary duty allegation against majority shareholders who distributed corporate profits in the form of a "bonus" to a majority shareholder, rather than as a "dividend" to all shareholders, created a question of fact. *See Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. App. 2000) (reversing summary judgment on breach of fiduciary duty claim).

*Id.* at 103.

After analyzing case law from other states and districts, the Colorado Court of Appeals ultimately concluded that the "Tisch siblings had a distinct, proprietary interest in their share of these undeclared distributions that allowed them to bring an *individual* claim against Gary for civil theft." *Id.* at 106 (emphasis added).

In this case, by alleging that Defendants have diverted profits that should have been distributions, Plaintiffs have pled their allegations to fit tidily within the confines of *Tisch* and, therefore, can proceed on their direct claims for damages. For example, Plaintiffs allege that Bridgeport profits that would have been distributed to them were instead used to purchase personal equipment, products, and memberships for the benefit of David Kramer, his family, and his personal racing team, and to pay inflated, over-market prices for enzymes and products from suppliers in a quid-pro-quo arrangement to secure lucrative sponsorships for Kramer and his racing teams. Dkt. #59 at 3–4, ¶¶ 5–6. Further, Plaintiffs allege that Defendants' conduct has negatively impacted Bridgeport and Plaintiffs' interests by putting distributions at risk and causing substantial lost and impaired value of Plaintiffs' businesses. *Id.* at 37–38, ¶¶ 90–91. At least at this early stage of the case, this is enough to support individual claims.

Defendants attempt to distinguish *Tisch* from the present case, arguing that *Tisch* involved a controlling shareholder distributing corporate profits to himself and withholding any distributions from a minority shareholder. Per Defendants, Plaintiffs have not alleged that Defendants are majority or controlling shareholders.

This is a distinction without a difference. Bridgeport is a limited liability company, so there is no controlling or majority shareholder. Instead, Bridgeport is run by managers or member-managers. Plaintiffs allege that Kramer and Bornhoft are Class A

10

Managers of Bridgeport's Board of Managers (Dkt. #59 at 2–3, ¶ 4), and the holders of Class A units are permitted to appoint a majority (four out of seven) Managers of the Bridgeport Board. *Id.* at 13–14, ¶¶ 29–30. Accordingly, Plaintiffs suggest that Bornhoft and Kramer had the power to install the majority of the board and direct them in ways that benefitted Kramer. Defendants, therefore, exercise control of the company and have allegedly used that power to siphon corporate profits (that otherwise would have been distributed) for the benefit of Mr. Kramer and his race team, to the detriment of Plaintiffs and their businesses. Thus, the Court finds that the logic of *Tisch* applies, at least at this stage in the litigation. Defendants deny that Kramer and Bornhoft have control over or direct the company, but they conceded at oral argument that Plaintiffs have pled that Kramer and Bornhoft control Bridgeport. At the motion to dismiss stage, these allegations are sufficient.[6]

The Court also notes that, during oral argument, the parties clarified that Plaintiffs have asserted derivative claims separately, in a private arbitration due to an arbitration agreement. Often, derivative and direct claims are pled in the alternative in the same action. Plaintiffs represent that, absent that arbitration agreement, the derivative claims would have been asserted in this suit. The fact that the derivative claims are pled separately due to an arbitration agreement should not automatically defeat the direct claims where, as here, there are allegations that plausibly allege direct, individual harm. And, though the Court does have concerns about double recovery should the Plaintiffs

---

[6] Defendants also suggested at oral argument that *Tisch* is distinguishable because Bridgeport is not a closely held corporation. However, the consideration of this issue requires the Court to consider information outside the four corners of the complaint, and neither party has briefed the issue. Thus, the Court declines to consider it at this time.

prevail on behalf of the corporation on the derivative claims in arbitration, such concerns are appropriately addressed later in the proceedings through summary judgment briefing, motions in limine, or jury instructions.

Accordingly, the Court will not dismiss Plaintiffs' claims on the grounds that they have not plausibly alleged direct harms. This was the only argument raised with respect to the breach of contract and tortious interference claims. Thus, these claims will proceed.

## II. Plaintiffs' claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty should be dismissed.

The conclusion that Plaintiffs may proceed with direct claims is not the end of the inquiry on the allegations of breach of fiduciary duty. To prove a breach of fiduciary duty, a plaintiff must prove (1) that the defendant was acting as a fiduciary of the plaintiff; (2) that the defendant breached a fiduciary duty to the plaintiff; (3) that the plaintiff incurred damages; and (4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages. *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993). Similarly, the elements of the tort of aiding and abetting a breach of fiduciary duty include: "(1) breach by a fiduciary of a duty owed to a plaintiff, (2) a defendant's knowing participation in the breach, and (3) damages." *Nelson v. Elway*, 971 P.2d 245, 249 (Colo. App. 1998).

Defendants argue that Plaintiffs' claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty fail because the only duties that exist between the parties are provided for by contract, and all other duties have been disclaimed. And, because the duties between the parties arise solely from a contract, the claims for breach of fiduciary duties are barred. The Court agrees.

12

In their Amended Complaint, Plaintiffs allege that Kramer and Bornhoft, as Class A Managers of Bridgeport, owed Plaintiffs fiduciary duties, including the duty of loyalty, the duty to "exercise the utmost good faith and loyalty in the performance of their duties," and the duty to "use their best efforts on behalf of Plaintiffs to not engage in self-dealing, and to act for the benefit of Plaintiffs in all matters connected with Bridgeport." Dkt. #59 at 40, ¶ 103.

Fatal to Plaintiffs' breach of fiduciary duty claim are the specific terms of the Bridgeport Operating Agreement.[7] Section 7.18(a)–(c) of Operating Agreement sets forth the duties and obligations of Managers and provides:

> (a) The Board of Managers shall cause the Company to conduct its business and operations separate and apart from that of any Manager, Equity Owner, or any of its Affiliates.
>
> (b) The Board of Managers shall take Actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Colorado and each other jurisdiction in which such existence is necessary to protect the limited liability of Equity Owners or to enable the Company to conduct the business in which it is engaged, and (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of Property in accordance with the provisions of this Agreement and applicable laws and regulations.
>
> (c) Each Manager shall have the duty to discharge the foregoing duties in good faith, in a manner the Manager believes to be in the best interests of the Company, with the care an ordinarily prudent person in a like position would exercise under similar circumstances.
>
> (d) The Managers *shall be under no other duty (fiduciary or otherwise)* to the Company or the Members to conduct the affairs of the Company in a particular manner."

---

[7] The Court may consider the Bridgeport Operating Agreement without converting the motion into a motion for summary judgment because it is mentioned in and attached to the Amended Complaint (*see* Am. Compl. Ex. 1, Dkt. #59 at 45), central to the claims at issue, and not challenged as inauthentic. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002).

>        (e) Notwithstanding any provision of this Agreement to the contrary, the Managers, Equity Owners, and their Affiliates shall have no exclusive duty to act on behalf of the Company. Each Manager, Equity Owner, and their Affiliates may have other business interests and may engage in other activities in addition to those relating to the Company. . . . No Manager, Equity Owner, or their Affiliates shall incur any liability to the Company or to any of the Equity Owners as a result of engaging in any other business or venture, including, but not limited to, any business or venture which might be competitive with the business of the Company.

First Am. Compl. Ex. 1, Dkt. #59 at 67 (emphasis added). Under a proper reading of the contract, section 7.18(c) means that the managers are required to discharge only the "foregoing duties"—those set forth by contract in subsections (a) and (b)—in good faith and in the best interests of the company. Section 7.18(d) clearly and unambiguously disclaims any other duties to the Company or the Members, whether fiduciary or otherwise. Therefore, all other duties alleged by Plaintiffs but not listed in the contract—i.e., the duty to "exercise the utmost good faith and loyalty in the performance of their duties"; use "best efforts on behalf of Plaintiffs not to engage in disloyal acts"; "not eliminate or oppress Plaintiffs as members"; "not engage in self-dealing"; and "act for the benefit of Plaintiffs in all matters connected with Bridgeport," have been clearly been clearly and unambiguously disclaimed.

Colorado law allows for the express disclaimer of such duties in an operating agreement. *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 428 P.3d 567, 575 (Colo. App. 2016), *aff'd*, 420 P.3d 223 (Colo. 2018); *see also* Colo. Rev. Stat. § 7-80-108(1.5) (a manager's duties "*may be restricted or eliminated by provisions in the operating agreement*, as long as any such provision is not manifestly unreasonable")

14

(emphasis added).[8] The Colorado Court of Appeals in *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC,* 486 P.3d 439, *reh'g denied* (Feb. 4, 2021) addressed a case that involved claimed fiduciary duties notwithstanding disclaimers in an operating agreement. Interpreting Delaware law, the court there found that, though the parties had modified the duty of loyalty in the operating agreement, it had not been fully and unambiguously disclaimed, and therefore a fiduciary duty remained. But this case is distinguishable from *McWhinney*. There, the section of operating agreement dealing with the defendant's duties to plaintiff as manager and member included a "duty in carrying out its duties and responsibilities under this Agreement of good faith, loyalty, and fair dealing to" the plaintiff. *Id.* at 446–47. The operating agreement also provided that the defendant: "shall manage or cause the affairs of the Company to be managed in a prudent and businesslike manner" but "shall not be restricted in any manner from participating in any other business activities, notwithstanding the fact that the same might be competitive with the business of" plaintiff; "[i]n carrying out its powers and duties hereunder, shall exercise its best efforts, [and] shall owe a duty of good faith and fair dealing to" plaintiff; and "shall not be liable to [plaintiff] for any actions taken on behalf of [plaintiff] in good faith and reasonably

---

[8] In their response, Plaintiffs argue that the disclaimer is manifestly unreasonable. But the Plaintiffs have nowhere alleged that the disclaimer is "manifestly unreasonable," and they cannot amend their complaint through a response brief. Nor do they point to any case law that a complete disclaimer of fiduciary duties is per se unreasonable. Further, Plaintiffs' argument that the reasonableness of the disclaimer is, at the very least, disputed and therefore should not be decided at the motion to dismiss stage is unpersuasive. As previously set forth, the Court may properly consider the terms of the Operating Agreement at issue here, including to determine whether the disclaimer of fiduciary duties is clear and unambiguous. *Rocky Mountain Expl., Inc.*, 428 P.3d at 575 (citing cases).

believed to be in the best interest of [plaintiff] or for errors of judgment made in good faith," but shall be liable for "actions and omissions involving actual fraud, gross negligence, or willful misconduct or from which such Member derived improper personal benefit." *Id.* Thus, the *McWhinney* disclaimer was more limited than the clear and unambiguous disclaimer of fiduciary duty found in the instant case.

The Bridgeport Operating Agreement contains no analogous provisions modifying, but still imposing, the duty of loyalty. Instead, section 7.18(d) of the Bridgeport Operating Agreement sets forth the duties that are owed, then expressly and unambiguously disclaims all others, fiduciary or otherwise.

Accordingly, the only duties Defendants owe Plaintiffs are those arising from the Operating Agreement in section 7.18(a)–(b). The Court notes Plaintiffs have plausibly alleged that Kramer has breached 7.18(a) by diverting Bridgeport funds to his personal racing teams, thus mingling Bridgeport business with his own. But this, in part, forms the basis of the breach of contract claim which will survive this motion to dismiss. There is no independent breach of fiduciary duty—the duty arises solely from contract. Without any fiduciary duty owed to Plaintiffs, a breach of fiduciary duty and aiding and abetting a breach of fiduciary duty claims should be dismissed.

**III. Plaintiffs have plausibly alleged a civil theft claim.**

Finally, Defendants argue that Plaintiffs have failed to state a civil theft claim against Kramer and Bornhoft. The Court is not persuaded.

The Colorado civil theft statute provides:

All property obtained by theft, robbery, or burglary shall be restored to the owner . . . [who] may maintain an action . . . against the taker thereof . . . . In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is

greater, and may also recover costs of the action and reasonable attorney fees.

Colo. Rev. Stat. § 18-4-405. "To prevail on [a claim of civil theft] the plaintiff must 'establish that (1) defendant knowingly obtained control over his property without authorization and (2) defendant did so with the specific intent to permanently deprive him of the benefit of the property.'" *Welch v. Saunders*, 720 F. App'x 476, 480 (10th Cir. 2017) (citing *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009)).

Plaintiffs' civil theft claim alleges that Kramer and Bornhoft "obtained and maintained control over Plaintiffs' property, assets, rights, and monies without authorization" with the intent to permanently deprive them of it. Dkt. #59 at 42, ¶¶ 114–15. Defendants argue that Plaintiffs do not have a proprietary interest in theoretical, unquantifiable future distributions, so their civil theft claim fails.

Again, *Tisch* is directly on point, and it supports the viability of the civil theft claim. In *Tisch*, the defendant contended that his siblings did not have a property interest in the Liquor Barn's profits because he had never declared a shareholder distribution. *Tisch*, 439 P.3d at 102. The Colorado Court of Appeals disagreed, concluding that whether the payments Gary made to himself and his entities "constituted a 'distribution of profits' payable to all shareholders—from which he wrongfully withheld the Tisch siblings' share—was a factual question for the jury." *Id.* at 102. The jury found that they were. As the court explained:

> Civil theft requires the proof of two elements: (1) the defendant knowingly obtained control over the plaintiff's property without authorization and (2) the defendant did so with the specific intent to permanently deprive the plaintiff of the benefit of the property. *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009); *see* § 18-4-401(1), C.R.S. 2018 (theft); § 18-4-405 (rights in stolen property). Property or money belongs to

> another if anyone other than the defendant has a possessory or proprietary interest in it. § 18-4-401(1.5).
>
> A "proprietary interest" is an ownership interest in the subject property. *See* Webster's Third New Int'l Dictionary 1819 (2002) ("proprietary" means "held as the property of a private owner"); Black's Law Dictionary 934, 1280 (10th ed. 2014) ("interest" is a legal or equitable claim to or right in property; "ownership" implies the right to possess a thing, regardless of any actual or constructive control).

*Id.* at 103–04. And, as previously discussed, the court found the Tisch siblings had an individual, proprietary interest in their share of undeclared distributions. *Id.* at 105.

Plaintiffs claim they have a proprietary interest in the allegedly diverted corporate profits, provided that such monies constitute a distribution. *See* Dkt. #59 at 3, ¶ 5; 14, ¶ 34; 38, ¶ 91. The possibility remains that a jury may not find that the diverted profits here constituted distributions to which Plaintiffs were entitled, but that issue is not appropriately before the Court at this time and is best left for the finder of fact.

Defendants next argue that there are no plausible allegations that Kramer or Bornhoft took property by theft, robbery, or burglary. This argument also fails.

The civil theft statute itself does not define theft, robbery, or burglary, but these terms are understood within the broader criminal statutory framework. *Itin v. Ungar*, 17 P.3d 129, 133 (Colo. 2000) (citing *Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 n.6 (Colo. 1991)); *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1156–57 (Colo. 2019). Thus, in relevant part, "[a] person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception." Colo. Rev. Stat. § 18-4-401(1). Here, Plaintiffs allege that Kramer and Bornhoft misappropriated funds without authorization. Dkt. #59 at 42, ¶ 115. This is

analogous to the civil theft claim that survived a motion for directed verdict in *Tisch*. The Court, therefore, finds no basis to dismiss Plaintiffs' civil theft claim.

## CONCLUSION

In light of the foregoing, it is hereby **RECOMMENDED** that Defendants Kramer and Colorado Agri Products, LLC's Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. #66) and Defendant Bornhoft's Motion to Dismiss Plaintiffs' First Amended Complaint (Dkt. #84) be **GRANTED** with respect to the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims but **DENIED** in all other respects.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge,** *Thomas v. Arn*, **474 U.S. 140, 148–53 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.*, **183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse*, **91 F.3d 1411, 1412–13 (10th Cir. 1996).**

Date: December 29, 2022

_____
N. Reid Neureiter
United States Magistrate Judge